**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| MAYOR & CITY COUNCIL OF BALTIMORE<br><br>     Plaintiff,<br><br> v.<br><br>PURDUE PHARMA L.P., *et al.,*<br><br>    Defendants. | Case No. 1:18-cv-00800-CCB |

**MEMORANDUM OF LAW IN SUPPORT OF
MAYOR AND CITY COUNCIL OF BALTIMORE'S MOTION TO REMAND**

## TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................................1

II.     THERE IS NOT COMPLETE DIVERSITY AMONG THE PARTIES...........................4

        A.      Federal Rule 21 provides no basis to sever Rosen-Hoffberg...................................5

        B.      If adopted, Defendants have not established fraudulent misjoinder.....................10

        C.      Defendants cannot meet the "heavy burden" of fraudulent joinder......................13

III.    THE CITY'S MOTION TO REMAND WARRANTS EXPEDITED
        TREATMENT ............................................................................................................15

# TABLE OF AUTHORITIES

## Cases

*Boone v. Duffy Box & Recycling, Inc.*,
    No. 3:17-cv-400, 2017 WL 6100329 (W.D.N.C. Dec. 6, 2017) ..................................... 5, 6

*Brown v. Endo Pharms.*,
    38 F. Supp. 3d 1312 (S.D. Ala. 2014) .................................................................... 5

*Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*,
    636 F.3d 101 (4th Cir. 2011) ............................................................................. 4

*City of Huntington v. AmerisourceBergen Drug Corp.*,
    No. 3:17-01362, 2017 WL 3317300 (S.D.W. Va. Aug. 3, 2017) .............................. 12, 13

*County Commission of McDowell County v. McKesson Corp.*,
    263 F. Supp. 3d 639 (S.D.W. Va. 2017) .................................................................. 12, 13

*Cty. of Hopkins v. Purdue Pharma, L.P.*,
    Case No. 17-cv-845 (E.D. Tex. Dec. 20, 2017) ........................................................ 4, 16

*Hartley v. CSX Transp., Inc.*,
    187 F.3d 422 (4th Cir. 1999) ............................................................................. 13, 14

*Home Buyers Warranty Corp. v. Hanna*,
    750 F.3d 427 (4th Cir. 2014) ............................................................................. 10

*In re Yazmin and Yaz (Drospirenone) Mktg., Sales Practices & Products Liab. Litig.*,
    779 F. Supp. 2d 846 (S.D. Ill. 2011) ...................................................................... 11

*Interior Cleaning Sys., LLC v. Crum*,
    No. 14-0199-WS-N, 2014 WL 3428932 n.10 (S.D. Ala. July 14, 2014) ......................... 5

*Jamison v. Purdue Pharma Co.*,
    251 F. Supp. 2d 1315 (S.D. Miss. 2003) ................................................................. 5

*K-Beech, Inc. v. Does 1-22*,
    No. 11–cv–01774–AW, 2011 WL 6000768 (Bankr. D. Md. Nov. 29, 2011) ................. 12

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ........................................................................................ 4

*Larson v. Abbott Labs.*,
    No. ELH–13–00554, 2013 WL 5937824 (D. Md. Nov. 5, 2013) ............................. passim

*Mulcahey v. Columbia Organic Chems. Co.*,
    29 F.3d 148 (4th Cir. 1994) ............................................................................. 3, 4, 5

*Newman-Green, Inc. v. Alfonzo-Larrain*,
    490 U.S. 826 (1989) ........................................................................... 5, 6

*Palisades Collections LLC v. Shorts*,
    552 F.3d 327 (4th Cir. 2008) ................................................................. 4

*Palmetto Health All. v. S.C. Elec. & Gas Co.*,
    11-cv-2060, 2011 WL 5027162, (D.S.C. Oct. 21, 2011)................................ 11

*Rouse v. State Farm Mut. Auto. Ins. Co.*,
    No. 14–cv–690, 2015 WL 3849648 (M.D.N.C. June 22, 2015) ........................ 5

*Sodibar Sys., Inc. v. Simon*,
    No. PWG-13-3399, 2014 WL 1276441 (D. Md. Mar. 26, 2014) ...................... 13

*Sons of the Revolution in N.Y., Inc. v. Travelers Indem. Co. of Am.*,
    No. 14 Civ. 03303 (LGS), 2014 WL 7004033 (S.D.N.Y. Dec. 11, 2014) ........... 5

*State of New Hampshire v. Purdue Pharma L.P.*,
    No. 17-cv-427 (D.N.H.) ...................................................................... 16

*Staubus v. Purdue Pharma, L.P.*,
    No. 2:17-CV-122-TAV-CLC, 2017 WL 4767688 (E.D. Tenn. Oct. 20, 2017) ...... 4

*Stephens v. Kaiser Found. Health Plan of the Mid-Atlantic States*,
    807 F. Supp. 2d 375 (D. Md. 2011) ........................................... 10, 11, 13

*Sullivan v. Calvert Memorial Hospital*,
    117 F. Supp. 3d 702 (D. Md. 2015) ......................................................... 6

*Syngenta Crop Prot., Inc., v. Henson*,
    537 U.S. 28 (2002).............................................................................. 4

*Tadjer v. Montgomery Cty.*,
    300 Md. 539 (1984) ........................................................................... 15

*Tinsley v. Streich*,
    143 F. Supp. 3d 450 (W.D. Va. 2015) ............................................... 11, 13

*U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.*,
    741 F.3d 390 (4th Cir. 2013) ............................................................... 10

*United Mine Workers of Am. v. Gibbs*,
    383 U.S. 715 (1966)........................................................................... 12

*Zirkle v. Valley Forge*,
    No. 1:15CV82, 2015 WL 4729327 (N.D.W. Va. Aug. 10, 2015) .................... 11

**Statutes**

28 U.S.C. § 1441(a) ......................................................................................... 5

**Rules**

Fed. R. Civ. P. 20 .......................................................................................... 12

Fed R. Civ. P. 12(b)(6) .................................................................................. 13

Fed R. Civ. P. 82 ........................................................................................... 11

Md. Rule 3-212 .............................................................................................. 12

**Other Authorities**

Manual for Complex Litigation § 20.131 (4th ed. 2004) ........................... 3, 16

Restatement (Second) of Torts § 821B ......................................................... 15

Gary Wilson et. al, *The Future of Products Liability in America*,
        27 Wm. Mitchell L. Rev. 85 (2000) ................................................. 15

## I.   __INTRODUCTION__

The opioid crisis in Baltimore cannot be explained without reference to both opioid manufacturers, who deceptively marketed their drugs nationwide, and Rosen-Hoffberg Rehabilitation and Pain Management Associates, who reinforced the manufacturers' misleading messages in Baltimore and fueled the opioid use disorders created by this scheme. The opioid manufacturers knew that Rosen-Hoffberg Rehabilitation and Pain Management Associates, its medical director, Norman B. Rosen, and its associate medical director, Howard Hoffberg, (collectively, "Rosen-Hoffberg," or the three "Rosen-Hoffberg" defendants) were grossly overprescribing opioids to Baltimore residents. They knew, for instance, that Dr. Hoffberg was prescribing opioids to *92%* of his patients, a rate exceeding the nationwide average range by approximately *six hundred and fifty-seven percent*. Yet instead of taking action to report or curb this behavior, the manufacturers encouraged it by generously paying Dr. Hoffberg. In turn, Rosen-Hoffberg displayed the manufacturers' misleading messages on its website, and even taught those messages at a medical conference at a Baltimore hospital as recently as October 2017. This interrelated conduct has resulted in a public health crisis in Baltimore of historic proportions.

Underscoring the significance of Rosen-Hoffberg to this case, on February 27, 2018—weeks *after* the City of Baltimore filed this lawsuit—federal agents from the FBI, DEA, and Department of Health and Human Services executed search warrants at Rosen-Hoffberg's two offices in Maryland.[1] A DEA special agent on site explained that the searches, which were based on probable cause, were part of an active investigation seeking evidence of "health care fraud"

---

[1] Alison Knezevich, *Federal Search Warrants Executed at Pain Clinics in Baltimore County*, Baltimore Sun (Feb. 27, 2018, 5:40pm) http://www.baltimoresun.com/news/maryland/baltimore-county/bs-md-co-clinics-searched-20180227-story.html/.

1

and "over-prescribing of opioids."[2] The searches appear to be part of Department of Justice's

task force to combat America's opioid crisis "at every level of the distribution system," which

includes investigations into manufacturers, distributors, pain management clinics, and individual

physicians.[3]

      As part of an ongoing effort to combat this crisis in Baltimore, the Mayor and City

Council of Baltimore (the "City") filed a complaint in the Circuit Court of Maryland for

Baltimore City on January 31, 2018 against leading opioid manufacturers, opioid distributers,

and Rosen-Hoffberg. All Defendants, including Rosen-Hoffberg, are joined in the Complaint's

public nuisance and negligence counts. And even the counts that are not asserted directly against

Rosen-Hoffberg—counts under Maryland's Consumer Protection Act and False Claims

Statute—implicate Rosen-Hoffberg as well.

      The manufacturer and distributor Defendants have removed this case to federal court and

invoked diversity jurisdiction, even though complete diversity is plainly absent on the face of the

complaint. To get around this problem, they argue that the Court should ignore Rosen-Hoffberg

based on a collection of controversial legal doctrines, several of which have never been accepted

by the United States Court of Appeals for the Fourth Circuit. Even if these theories were

adopted, not one would support federal jurisdiction in this case, as the factual and legal inquiries

regarding the Defendants are intertwined.

      What Defendants *really* want is for this Court to do nothing. Defendants will undoubtedly

soon attempt to have this case consolidated in the multidistrict litigation action that is now

---

[2] Ava-joye Burnett, *FBI, DEA Raid Local Pain Management Company*, CBS Baltimore (Feb. 27, 2018, 11:20pm) http://baltimore.cbslocal.com/2018/02/27/fbi-dea-raid-local-pain-management-company/; Barry Simms, *Federal Agents Raid Towson Pain Management Clinic*, WBAL TV (Feb. 27, 2018, 6:13pm), http://www.wbaltv.com/article/federal-agents-raid-towson-pain-management-clinic/18862939.

[3] *Attorney General Sessions Announces New Prescription Interdiction & Litigation Task Force*, Department of Justice, Office of Public Affairs (Feb. 27, 2018), https://www.justice.gov/opa/pr/attorney-general-sessions-announces-new-prescription-interdiction-litigation-task-force.

pending in the Northern District of Ohio. *See* In re: National Prescription Opiate Litigation, MDL No. 2804 ("Opioids MDL"). And at a telephone conference held on December 13, 2017, the Defendants urged the MDL court to refrain from ruling on the then-pending seventeen remand motions until after discovery and settlement discussions are conducted. *See* Ex. 1 at 17:8-18:6. In short, Defendants wish to have this case—which was properly filed in Baltimore City, and over which federal jurisdiction is lacking—sit idly in a federal district court in Ohio for months or years before it determines whether the case should be in federal court in the first place. That is a plainly improper use of the MDL process, which is designed to consolidate only those cases that are properly in federal court. If this Court rules that removal is proper, then the case will go to the MDL. But if this Court determines that removal is improper—which it plainly is— then the case should never be sent to the MDL in the first place. Defendants should not be able to abuse the MDL process by using years-long delays to circumvent the "strict" limitations on federal power encoded in the removal statute and Article III, Section 2 of the United States Constitution. *See Mulcahey v. Columbia Organic Chems. Co.*, 29 F.3d 148, 151 (4th Cir. 1994) (removal statute is to be "strictly construe[d]" against removal to federal court).

Nor can there be any doubt that this Court has the power to rule on this motion now. Unless and until this action is transferred to the MDL court, this Court retains full authority to rule on a motion to remand. *See* JPML Rule 2.1(d) (noting that even a conditional transfer order "does not affect or suspend orders and pretrial proceedings in any pending federal district court action and does not limit the pretrial jurisdiction of that court"). In fact, because the right to litigate in the MDL depends on the existence of federal jurisdiction in the first place, motions to remand are "particularly appropriate for resolution before the Panel acts." Manual for Complex Litigation § 20.131 (4th ed. 2004). Several district courts around the country have granted

remand motions in opioid cases prior to the cases being sent to the MDL. *See, e.g.*, *Cty. of Hopkins v. Purdue Pharma, L.P.*, Case No. 17-cv-845 (Docket No. 33) (E.D. Tex. Dec. 20, 2017); *Staubus v. Purdue Pharma, L.P.*, No. 2:17-CV-122-TAV-CLC, 2017 WL 4767688 (E.D. Tenn. Oct. 20, 2017). Accordingly, this Court should consider this motion expeditiously, and should remand this case to the Baltimore City Circuit Court.

## II.     THERE IS NOT COMPLETE DIVERSITY AMONG THE PARTIES

The federal courts "are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Accordingly, a "suit commenced in state court must remain there until cause is shown for its transfer under some act of Congress." *Syngenta Crop Prot., Inc.*, *v. Henson*, 537 U.S. 28, 32 (2002) (internal quotation marks omitted). "The burden of establishing federal jurisdiction is placed upon the party seeking removal." *Mulcahey*, 29 F.3d at 151. Courts are "obliged to construe removal jurisdiction strictly because of the significant federalism concerns implicated." *Palisades Collections LLC v. Shorts*, 552 F.3d 327, 333-34 (4th Cir. 2008) (internal quotation marks omitted). "[I]f federal jurisdiction is doubtful, a remand to state court is necessary." *Id.*

Where, as here, the removing party has invoked diversity jurisdiction, it is that party's burden to demonstrate that diversity is "complete," that is, that no defendant in the case is a citizen of the same state as any plaintiff. *See Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011); *Larson v. Abbott Labs.*, No. ELH–13–00554, 2013 WL 5937824, at *5 (D. Md. Nov. 5, 2013). Here, of course, the City of Baltimore and all three Rosen-Hoffberg defendants are citizens of Maryland for purposes of diversity jurisdiction. Thus, jurisdiction based on diversity of citizenship is lacking.

### A.   **Federal Rule 21 provides no basis to sever Rosen-Hoffberg.**

To overcome this fundamental problem, Defendants argue that the Court should simply sever the three Rosen-Hoffberg defendants, thereby *creating* diversity jurisdiction. But this suggestion runs squarely against the removal statute, which is to be "strictly construe[d]" against removal to federal court. *Mulcahey*, 29 F.3d at 151 (4th Cir. 1994). The removal statute provides that a case may be removed only in cases where federal courts "have original jurisdiction." 28 U.S.C. § 1441(a). A case in which parties must be severed before jurisdiction exists is not a case in which federal courts "have original jurisdiction." Prior to determining whether the case should be in federal court, federal courts are not permitted to take any action on the case, including severing claims. For these reasons, courts have been "reluctan[t] to employ Rule 21 in the removal context," because doing so would "circumvent the strict constraints of the removal statute and unduly expand diversity jurisdiction." *Rouse v. State Farm Mut. Auto. Ins. Co.*, No. 14–cv–690, 2015 WL 3849648, at *5 (M.D.N.C. June 22, 2015); *see also Boone v. Duffy Box & Recycling, Inc.*, No. 3:17-cv-400, 2017 WL 6100329, at *4 (W.D.N.C. Dec. 6, 2017). Neither the Supreme Court nor the Fourth Circuit has approved of the use of Rule 21 to manufacture federal jurisdiction, and courts across the country have criticized this procedure, including in cases where the Defendants were parties. *See, e.g.*, *Interior Cleaning Sys., LLC v. Crum*, No. 14-0199-WS-N, 2014 WL 3428932, at *5 n.10 (S.D. Ala. July 14, 2014) (collecting cases); *Brown v. Endo Pharms.*, 38 F. Supp. 3d 1312, 1326 (S.D. Ala. 2014); *Sons of the Revolution in N.Y., Inc. v. Travelers Indem. Co. of Am.*, No. 14 Civ. 03303 (LGS), 2014 WL 7004033, at *2 (S.D.N.Y. Dec. 11, 2014); *Jamison v. Purdue Pharma Co.*, 251 F. Supp. 2d 1315, 1321 n.6 (S.D. Miss. 2003).[4]

---

[4] To be sure, Rule 21 permits federal courts to dismiss non-diverse dispensable parties to *preserve* federal jurisdiction that has already been exercised, though even that technique is to be used "sparingly." *Newman-Green,*

In the face of this authority, Defendants rely heavily on *Sullivan v. Calvert Memorial Hospital*, 117 F. Supp. 3d 702 (D. Md. 2015). *Sullivan*, however, is distinguishable. There, the plaintiff suffered injuries after surgical procedures involving the implantation and removal of a medical device. She brought medical negligence claims against the in-state medical providers and products liability claims against the out-of-state manufacturers of the device. *Id.* at 704. She did not bring a single count against both the medical providers and the manufacturers, and the theories of liability against the two sets of defendants were distinct. The only real connection between the two was that they involved "the same physical object." *Id.* at 706. The court severed the claims against the medical providers because "the medical negligence claims against the Maryland Healthcare Defendants involve legal standards and factual inquiries distinctly different from the products liability claims against the Ethicon Defendants." *Id.* at 706.

Here, by contrast, the allegations against Rosen-Hoffberg and the Manufacturing Defendants are deeply intertwined, both factually and legally. As a legal matter, the City has brought claims for public nuisance and negligence against *all* Defendants, and alleges that all Defendants have contributed to the opioid crisis in Baltimore. And even the claims asserted only against the Manufacturing Defendants implicate Rosen-Hoffberg. Rosen-Hoffberg repeated the Manufacturing Defendants' misleading messages that are the core of the Maryland Consumer Protection Act claims, and Rosen-Hoffberg wrote medically unnecessary opioid prescriptions that were paid for by Baltimore's health plans—prescriptions which form the basis of the Maryland False Claims Statute claims against the Manufacturing Defendants. Compl. ¶¶ 218-

---

*Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 837 (1989). But Rule 21 does not allow courts to manufacture removal jurisdiction where it would otherwise be absent. *See, e.g., Boone v. Duffy Box & Recycling, Inc.*, 2017 WL 6100329, at *4 (W.D.N.C. Dec. 6, 2017) ("Rule 21 has generally been applied to suits that had complete diversity at the time of filing and the challenge to diversity did not arise until after the parties had engaged in significant litigation in federal court." (internal quotation marks omitted)).

220. As just one example, Baltimore paid for 367 days-worth of supply—or 760 tablets—for one of Rosen-Hoffberg's patients in 2014. Compl. ¶ 220.

Factually, Rosen-Hoffberg operated as an integral part of the Manufacturing Defendants' campaign to create and access the lucrative market for chronic pain treatments in Baltimore. As alleged, the Manufacturing Defendants developed a campaign of misinformation regarding the efficacy of opioids for the treatment of chronic pain. This campaign understated the risk of addiction, exaggerated the benefits of long-term opioid treatment, overstated the reliability of screening tools, and peddled the misleading concept of "pseudoaddiction"—the unsupported notion that drug-seeking behaviors in patients should be seen not as signs of addiction but as indications of untreated pain requiring *more* opioids. Compl. ¶¶ 162-179. Defendants carried out this campaign by disseminating misleading literature to prescribers and consumers, by funding biased research, by speaking through ostensibly independent third-parties such as "Key Opinion Leaders" and "Front Groups," and by funding misleading medical education programs. Compl. ¶¶ 70-161.

Critical to the success of Defendants' scheme was the creation of pill mills like Rosen-Hoffberg that would prescribe opioids to patients on a long-term basis for chronic pain. The Manufacturing Defendants were undoubtedly aware that Rosen-Hoffberg in particular was prescribing opioids in numbers that could not possibly be justified by appropriate use. They knew because they maintain highly sophisticated and granular databases that track the prescribing decisions of doctors across the country, and those data show that Rosen-Hoffberg prescribed opioids at an extraordinary rate. *See* Compl. ¶¶ 223-225. The data show, for instance, that Dr. Hoffberg prescribed opioids to *92%* of his patients—a rate that exceeded the average practitioner in his field by approximately *six hundred and fifty-seven percent.* Compl. ¶ 206. The

data also show that Dr. Rosen prescribed opioids to *88%* of his patients. Compl. ¶ 207. And according to public findings issued by the Maryland State Board of Physicians, Dr. Rosen prescribed opioids to one patient at a rate of 40 pills *per day*, totaling over 1,200 tablets in a four-week period. Compl. ¶ 209. As the Maryland State Board of Physicians found, and as would have been obvious to the Manufacturing Defendants, "a patient taking 40 pills a day raises a concern that some of it could go elsewhere." *Id.* And the recent federal raids against Rosen-Hoffberg, likely a part of the Department of Justice's effort to "combat the opioid crisis at every level of the distribution system," confirms Rosen-Hoffberg's role in Defendants' scheme.[5]

But the connections between the Manufacturing Defendants and Rosen-Hoffberg are even more direct than that. Pharmaceutical companies often make payments to healthcare providers for items such as research, meals, travel, gifts, and speaking fees. The Centers for Medicare and Medicaid Services ("CMS") track those payments. Compl. ¶ 211. The CMS data plainly reveal that Dr. Hoffberg was a favorite target of the Manufacturing Defendants' largesse. In 2013, Dr. Hoffberg received payments from the pharmaceutical industry of $36,147.38, exceeding the national average of $1,583.31 by 2,283%. Compl. ¶ 212. In 2014, his payments totaled $63,988.69, exceeding the national average of $3,379.13 by 1,893%. *Id.* And in 2016, his payments totaled $18,041.61, exceeding the national average of $3,273.71 by 551%. *Id.* Many of these payments came directly from the Manufacturing Defendants; in 2014 and 2015 combined, Dr. Hoffberg received $26,166.94 from Purdue and $29,084.92 from Cephalon. *Id.* ¶ 213.

Perhaps even more telling is the extent to which Rosen-Hoffberg relied on, promoted, and reinforced the very messages developed and disseminated by the Manufacturing Defendants to support the long-term use of opioids to treat chronic pain. Rosen-Hoffberg's website describes

---

[5] *Attorney General Sessions Announces New Prescription Interdiction & Litigation Task Force,* Department of Justice, Office of Public Affairs (Feb. 27, 2018), https://www.justice.gov/opa/pr/attorney-general-sessions-announces-new-prescription-interdiction-litigation-task-force.

the clinic as a practice that is "willing to prescribe opioids," which serves patients with "chronic pain" from "any cause," and states that the clinic's goal is to "maximize[e]" those patients' "quality of life." Compl. ¶¶ 202, 204. The notion that opioids can improve the quality of life of patients suffering from chronic pain is one of the key misleading messages developed and promoted by the Manufacturing Defendants – and is a notion unsupported by reliable scientific evidence. *See* Compl. ¶¶ 65-66; 173-175. Moreover, the website echoes the Manufacturing Defendants' deceptive attempt to rebrand pain as "the fifth vital sign," describing pain as "one of the most important 'vital signs.'" Compl. ¶¶ 148-49; 203.

Most remarkable of all, Dr. Hoffberg, in his capacity as the "Associate Medical Director" of the Rosen-Hoffberg Rehabilitation and Pain Management Associates, directly promoted the Manufacturing Defendants' messages at a CME presentation in Baltimore, Maryland as recently as October 14, 2017. In a presentation at St. Agnes Hospital, Dr. Hoffberg announced to the audience that pain is "considered the fifth vital sign," promoted the misleading concept of pseudoaddiction, encouraged practitioners to use "addiction-screening tools" that have never been scientifically validated, and even displayed a slide that appears to have been taken directly from materials *created by the American Pain Foundation*. Compl. ¶ 217.[6] The American Pain Foundation, which was headquartered in Baltimore, was the most prominent of the Manufacturing Defendants' Front Groups, having received more than $10 million from opioid manufacturers between 2007 and 2012, more than half of which was supplied by Defendant Endo. Compl. ¶¶ 108-109. It shut down in 2012, days after the United States Senate Committee on Finance opened an investigation into the links between the organization and manufacturers of

---

[6] The citation at the bottom of the slide titled "Impact of Unrelieved Pain," though difficult to read in the filed-Complaint, reads as follows: "American Pain Foundation. Pain facts. Found at www.painfoundation.org/page.asp?file=Library/PainSurveys.htm. Accessed February 14, 2006."

opioid painkillers. *Id.* ¶ 110. Upon closing, the American Pain Foundation cited "irreparable economic circumstances." *Id.*

In short, the connections between the Manufacturing Defendants and Rosen-Hoffberg run deep. Even if this Court were to conclude that Rule 21 confers courts with discretion in some cases to sever non-diverse defendants at the time of removal, this is not that case. Instead, severance of Rosen-Hoffberg would undermine the efficiency gains from joining the key contributors to Baltimore's opioid crisis in a single action, as well as the foundational principle that "the plaintiff is the master of the complaint and has the option of naming only those parties the plaintiff chooses to sue." *U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 406 (4th Cir. 2013) (internal quotation marks omitted); *see also Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 435-36 (4th Cir. 2014) (noting that a plaintiff has "a powerful interest in having all of the defendants together and adjudicating all of her claims before one tribunal" and would face a substantial "prospect of prejudice from parallel proceedings").

### B.       If adopted, Defendants have not established fraudulent misjoinder.

As an alternative basis for removal, Defendants argue that the Court should ignore Rosen-Hoffberg based on the doctrine of fraudulent misjoinder. Fraudulent *mis*joinder—distinct from the doctrine of fraudulent joinder—occurs "when a plaintiff includes claims against certain defendants that, while provable, have no real connection to the claims against other defendants in the same action and were only included in order to defeat diversity jurisdiction and removal." *Larson*, 2013 WL 5937824, at *11. (internal quotation marks and alterations omitted). It is a "new[] and . . . ambiguous doctrine" and it is "not as widely accepted as the doctrine of fraudulent joinder." *Stephens v. Kaiser Found. Health Plan of the Mid-Atlantic States*, 807 F. Supp. 2d 375, 379 (D. Md. 2011); *Larson*, 2013 WL 5937824 at *11. "The Fourth Circuit has not addressed the doctrine of fraudulent misjoinder, and the status of the doctrine among district

courts is muddled." *Larson*, 2013 WL 5937824 at *12 (collecting cases). The majority of circuit courts have not recognized the doctrine, and the United States Court of Appeals for the Eleventh Circuit is the only Court of Appeals to have expressly sanctioned its application. *See Zirkle v. Valley Forge*, No. 1:15CV82, 2015 WL 4729327, at *3 n.3 (N.D.W. Va. Aug. 10, 2015) (citations omitted).

There are good reasons for this Court to reject the doctrine altogether. As several courts have noted, it is an "improper expansion of diversity jurisdiction by the federal courts which unnecessarily complicates the removal analysis and is confusing in its application." *In re Yazmin and Yaz (Drospirenone) Mktg., Sales Practices & Products Liab. Litig.*, 779 F. Supp. 2d 846, 854 (S.D. Ill. 2011) (collecting cases); *see also Larson*, 2013 WL 5937824, at *13 & n.8 (noting the many "flaws" with the doctrine, including that it may violate Federal Rule of Civil Procedure 82, that it may contravene congressional intent, that it has engendered uncertainty in the courts, and that it raises federalism concerns). Among the sources of confusion are whether "egregiousness" or "something more than mere misjoinder" is required, and whether a court should analyze the propriety of the joinder under state or federal rules. *Larson*, 2013 WL 5937824, at *12. Several courts in this circuit have declined to adopt the "fraudulent misjoinder" doctrine given the lack of guidance from the Fourth Circuit. *See, e.g.*, *Tinsley v. Streich*, 143 F. Supp. 3d 450, 458 (W.D. Va. 2015); *Palmetto Health All. v. S.C. Elec. & Gas Co.*, 11-cv-2060, 2011 WL 5027162, at *2 (D.S.C. Oct. 21, 2011).

But even if this Court accepts fraudulent misjoinder, the doctrine would not apply here. Where courts in this district have applied it, they ask whether the non-diverse defendants were properly joined under the relevant federal and state permissive joinder rules. *Stephens*, 807 F. Supp. 2d at 381; *see also Larson*, 2013 WL 5937824, at *13 (noting that the Maryland and

federal permissive joinder rules are identical). In other words, courts ask: (1) whether any claim to relief against the defendants arises out of the same "transaction or occurrence"; and (2) whether a "question of law or fact common to all defendants will arise in the action." *Larson*, 2013 WL 5937824, at *13 (citing Fed. R. Civ. P. 20 and Md. Rule 3-212). Under these rules, "the impulse is toward the broadest possible scope of action consistent with fairness to the parties and joinder of claims, parties and remedies is strongly encouraged." *K-Beech, Inc. v. Does 1-22*, No. 11–cv–01774–AW, 2011 WL 6000768, at *2 (Bankr. D. Md. Nov. 29, 2011) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966)).

For the same reasons described in Section II.A, the allegations in the present case satisfy both prongs of the permissive joinder rules. The core allegations in this case arise out of the development and promulgation of misleading messages regarding the use of opioids to treat chronic pain, and the ensuing harms inflicted upon the City of Baltimore. Both the Manufacturing Defendants and Rosen-Hoffberg played a key role in that scheme, and common questions with respect to both sets of Defendants abound. As just one example, Rosen-Hoffberg displayed the messages developed by the Manufacturing Defendants on its website and promoted them at a medical conference in Baltimore in 2017; one question common to both sets of Defendants, therefore, will be whether those messages were, in fact, misleading. There will also be common questions regarding the causal relationship between those messages and the harms suffered by the City, as well as questions surrounding the extent to which the Manufacturing Defendants directly targeted Maryland clinics such as Rosen-Hoffberg.

Thus, the connections between Rosen-Hoffberg and the other defendants are far more significant than those alleged in *County Commission of McDowell County v. McKesson Corp.*, 263 F. Supp. 3d 639, 646-47 (S.D.W. Va. 2017) and the companion case *City of Huntington v.*

*AmerisourceBergen Drug Corp.*, No. 3:17-01362, 2017 WL 3317300, at *5 (S.D.W. Va. Aug. 3, 2017). In *McDowell County* and *City of Huntington*, the only claimed connections between the in-state doctor defendant and corporate defendants were that the corporate defendants "allegedly flooded the market with opioids, and [the in-state doctor-defendant] prescribed some of them." *McDowell*, 263 F. Supp. 3d at 647; *Huntington*, 2017 WL 3317300, at *5. Here, the City's complaint alleges in great detail knowing and concerted action between the Manufacturing Defendants and Rosen-Hoffberg, which together caused serious harm to the City of Baltimore. All that is required for the claims to arise out of the same "transaction or occurrence" is that the claims have a "logical relationship to one another." *Stephens*, 807 F. Supp. 2d at 382; *see also Larson*, 2013 WL 5937824 at *13-14; *Tinsley*, 143 F. Supp. 3d at 459-62. The claims here more than satisfy that standard.

## C. <u>Defendants cannot meet the "heavy burden" of fraudulent joinder.</u>

Finally, Defendants do not even argue that Rosen-Hoffberg has been fraudulently misjoined. "To show fraudulent joinder, the removing party must demonstrate either [1] outright fraud in the plaintiff's pleading of jurisdictional facts or [2] that there is no *possibility* that the plaintiff would be able to establish a cause of action against the in-state defendant in state court." *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 424 (4th Cir. 1999) (emphasis in original, internal quotation marks omitted). The burden of a party alleging fraudulent joinder is a "heavy" one; the standard "is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Id.* The Court must "resolv[e] all issues of law and fact in the plaintiff's favor," and the plaintiff need only show a "slight possibility of a right to relief" or a "glimmer of hope" to prevail. *Id.* at 424, 426; *see also Sodibar Sys., Inc. v. Simon*, No. PWG-13-3399, 2014 WL 1276441, at *4 (D. Md. Mar. 26, 2014); *Larson*, 2013 WL 5937824, at *11. "Once the court identifies this glimmer of hope for the plaintiff, the

jurisdictional inquiry ends." *Hartley*, 187 F.3d at 426. Defendants do not attempt to meet this burden, as the City has shown far more than a "slight possibility of a right to relief" or a "glimmer of hope" in its claims against Rosen-Hoffberg.

As alleged in the Complaint, Rosen-Hoffberg contributed to the public nuisance that is the opioid crisis in Baltimore in countless ways. Most directly, it overprescribed dangerous opioid painkillers and failed to monitor its patients for the risk of diversion. Compl. ¶¶ 200-221. The Maryland State Board of Physicians found, with respect to one Rosen-Hoffberg patient, that the clinic prescribed 40 pills of oxycodone per day, totaling over 1,200 tablets in a two-week period, but "never screened the patient to verify that he was taking all of the oxycodone prescribed." Compl. ¶ 209. Clearly, as the Board noted, "a patient taking 40 pills a day raises a concern that some of it could go elsewhere," and Dr. Rosen "ignored the inherent risks to the patient and society." *Id.* This behavior was not limited to one patient; in another filing, the Board alleged that Dr. Rosen "consistently prescribed excessively high dosages . . . over prolonged periods of time," that he "failed to adequately monitor patients for the potential risk of diversion," and that Dr. Rosen "failed to significantly modify his treatment plan when patients demonstrated aberrant behavior that would raise concern for diversion." *Id.* ¶ 210. And the fact that Rosen-Hoffberg is not located in Baltimore is of no moment; not only has its behavior increased the City's need for spending on public health services, paramedic services, policing services, and criminal justice initiatives, and not only has the City paid directly for prescriptions written for Rosen-Hoffberg's patients, but the presentation given by Dr. Hoffberg described above, containing Defendants' misleading messages, was given at a hospital *in Baltimore*. Compl. ¶¶ 15-20; 217; 241-247. And as one neighbor who witnessed the recent federal raids on one of Rosen-Hoffberg's offices explained, "[t]he whole landscape of this whole complex has

changed because of this office and the transient people around."[7] In short, the City has shown far

more than a "slight possibility of a right to relief" or a "glimmer of hope" that Rosen-Hoffberg is

liable for public nuisance. *See Tadjer v. Montgomery Cty.*, 300 Md. 539, 552 (1984)

("Circumstances that may sustain a holding that an interference with a public right is

unreasonable include the following: Whether the conduct involves a significant interference with

the public health, the public safety, the public peace, the public comfort or the public

convenience . . . . " (quoting Restatement (Second) of Torts § 821B)).

## III.   THE CITY'S MOTION TO REMAND WARRANTS EXPEDITED TREATMENT

A timely ruling on this motion to remand is essential. Having improperly removed this

case to federal court, Defendants will undoubtedly soon attempt to have this case transferred to

the multidistrict litigation action pending in the Opioids MDL. If that transfer occurs, this Court

will lose the authority to decide this remand motion, and it is unclear when the motion will be

heard or decided. Defendants have urged the MDL court to refrain from ruling on the remand

motions any time soon, and no schedule has been set for their resolution. Ex. 1 at 14:12-18:18.

Indeed, once cases are consolidated into MDL proceedings, remand motions often linger for

years. In the *Vioxx* MDL, for example, motions for remand were stayed for more than seven

*years*, and, when the stay was finally lifted, the submission for opening briefs was set more than

a year out. *See* Exs. 2-3 (initial transfer order dated February 16, 2005 and order dated June 5,

2012 setting briefing schedule for remand motions); *see also* Gary Wilson et al., *The Future of

Products Liability in America*, 27 Wm. Mitchell L. Rev. 85, 104 (2000) ("[T]he MDL often

becomes a black hole from which cases, plaintiffs, and defendants cannot escape."). At this

juncture, however, the Court retains full authority to resolve the motion, and it would be

---

[7] Joy Lambert, *Feds Raid Pain Management Clinic in Towson & Owings Mills*, Fox Baltimore (Feb. 27, 2018), http://foxbaltimore.com/news/local/federal-raid-reported-at-towson-pain-management-clinic.

particularly appropriate for it to do so. *See* JPML Rule 2.1(d); Manual for Complex Litigation § 20.131 (4th ed. 2004).

Accordingly, the City filed an accompanying motion for expedited consideration of its motion to remand. If the Court does not rule on this motion to remand expeditiously, this case will get improperly swept up into the MDL proceedings, and it may be years before any court considers the propriety of Defendants' notice of removal. For this reason, and because of the great import of this litigation to the City of Baltimore, the City respectfully requests that this Court—like other courts have—set an expedited briefing schedule and promptly resolve the City's motion to remand. *See, e.g.*, *Cty. of Hopkins v. Purdue Pharma, L.P.*, Case No. 17-cv-845 (Docket No. 7; Dec. 15, 2017 Minute Entry; Docket No. 33) (E.D. Tex. Dec. 20, 2017) (ordering expedited briefing and granting remand motion within seven days of county's filing of motion); *State of New Hampshire v. Purdue Pharma L.P.*, Case No. 17-cv-427 (Docket No. 27 at 6:23-7:2; 14:16-18) (D.N.H.) (expediting consideration of state's motion to remand because such motions "tend to linger in the MDL . . . for a year or more before the judge has a time to get around to addressing them").

Dated: March 19, 2018

Respectfully Submitted,


_____/s/_____
Andre M. Davis (No. 00362)
City Solicitor

Suzanne Sangree (No. 26130)
Senior Counsel for Public Safety & Director
of Affirmative Litigation
City of Baltimore Department of Law
City Hall, Room 109
100 N. Holliday Street
Baltimore MD 21202
443-388-2190
suzanne.sangree2@baltimorecity.gov

Christopher R. Lundy (No. 29888)
Assistant Solicitor
Baltimore City Law Department
City Hall, Room 101
100 N. Holliday Street
Baltimore, Maryland 21202
(410) 396-1424
(410) 547-1025 (f)
christopher.lundy@baltimorecity.gov

Lydie E. Glynn (No. 29902)
Assistant Solicitor
Baltimore City Law Department
City Hall, Room 101
100 N. Holliday Street
Baltimore, Maryland 21202
(410) 396-3930 (phone)
(410) 547-1025 (fax)
lydie.glynn@baltimorecity.gov

SUSMAN GODFREY L.L.P.
William Christopher Carmody (*pro hac vice* motion to be filed)
Arun Subramanian (*pro hac vice* motion to be filed)
Seth Ard (*pro hac vice* motion to be filed)
Zachary B. Savage (*pro hac vice* motion to be filed)
Jillian Hewitt (*pro hac vice* motion to be filed)
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330
Fax: (212) 336-8340

*Attorneys for Plaintiff Mayor & City Council of Baltimore*